**DYNAMIC MACHINE CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 76–1036.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1976.

Decided March 31, 1977.

Lawrence I. Kipperman, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Michael S. Winer, John G. Elligers, Attys., N. L. R. B., Washington, D. C., for respondent.

Before SPRECHER and BAUER, Circuit Judges, and KUNZIG, Judge.*

BAUER, Circuit Judge.

The petitioner asks us to overturn a National Labor Relations Board order directing it to bargain with District No. 8, International Association of Machinists & Aerospace Workers, AFL–CIO. The Board cross-petitions for enforcement of its order. Before us for review are the Board's findings (1) that Dynamic Machine Co., a successor employer [1] to a firm that participated in a representation election won by the union, is obligated to bargain with the union; and (2) that Foreman Harry Tietz was a supervisor within the meaning of Section 2(11) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(11). We enforce the Board's order.

### I.

On March 20, 1974, a representation election was held among the employees of the petitioner's predecessor, which bore the same name (hereinafter 'Dynamic I"). Nineteen votes were cast in favor of union representation; 14 votes against. The union challenged 8 ballots, 6 on the ground that the votes were supervisors, 2 on other grounds. Dynamic I filed an objection to the election based on a union campaign letter distributed to the employees within a week of the election.

The Board conducted a hearing on the challenged ballots and the objection in June 1974. At the hearing, the parties stipulated to the counting of the two ballots that were challenged on grounds other than that the voter was a supervisor. Both ballots were found to have been cast against the union.

The tally then stood at 19 votes for representation, 16 against representation, with 6 challenges outstanding.

On September 3, 1974, the hearing officer issued a report denying Dynamic I's objection. He also denied the union's challenges to three of the ballots allegedly cast by supervisors and upheld its challenges to the other three ballots. Both Dynamic I and the union filed exceptions to the hearing officer's report with the Board.

On December 9, 1975, while these exceptions were pending before the Board, NJM Corporation agreed to purchase substantially all of Dynamic I's assets, including its name and goodwill. The agreement provided, with certain exceptions not relevant here, that NJM would not assume Dynamic I's liabilities or obligations. On January 6, 1975, the sale took place, and NJM began operating as Dynamic Machine Co. ("Dynamic II").[2]

The two companies are separate and distinct commercial entities. The stockholders, directors and officers of Dynamic II held no positions with Dynamic I and had at the time of the Board proceeding no familial or financial relationships with persons connected with Dynamic I. None of the three individuals with authority to formulate Dynamic II's labor and employment policies held or exercised such authority on behalf of Dynamic I.

At the time of the sale, Dynamic II was aware of the representation proceeding pending before the Board. After the sale, Dynamic II continued Dynamic I's business without interruption—operating the same plant, using identical methods and essentially the same equipment to manufacture the same type of products on the same job order basis for primarily the same customers. No job classifications were changed, nor were new foremen brought in from outside the plant. Dynamic II retained all

---

\* The Hon. Robert L. Kunzig, Judge of the United States Court of Claims, is sitting by designation.

1. When used in this opinion, the term "successor employer" has no significance other than that of referring to an employer who has succeeded to the operation of an existing business.

2. After the sale, Dynamic I became defunct and began dissolution.

thirty Dynamic I employees in the bargaining unit.

Between the date of the representation election and the date of purchase, 17 unit employees left Dynamic I, and 12 new employees were hired. Between the date of purchase and February 7, 1975, when Dynamic II refused to recognize the union, one employee who had voted in the election left the company, another was promoted to a supervisory position, and three new employees were hired.

On January 15, 1975, after the sale, the Board issued its decision certifying the union as the exclusive bargaining representative of Dynamic I's employees. The Board adopted the findings of the hearing officer respecting Dynamic I's objection. It also approved the three ballot challenges upheld by the hearing officer, but reversed his denial of the union's challenge to Harry Tietz's ballot. Because the two remaining union ballot challenges could not affect the outcome of the election (inasmuch as the final outcome would be 19–18 in favor of the union even if both challenges were denied and the ballots were found to be cast against the union), the Board certified the union without inquiring into their validity.

On February 7, 1975, the union requested a bargaining meeting and certain information from Dynamic II. Dynamic II replied that it was not required to commence negotiations or to submit the information, both because it was a separately incorporated entity unrelated to Dynamic I and because a substantial turnover of unit employees since the representation election called the union's majority status into question. On February 13, 1975, the union filed an unfair labor practice charge against Dynamic II with the board, alleging that the company had refused to bargain with the certified bargaining representative of its employees.[3]

On December 15, 1975, acting on a stipulation of facts after a waiver of intermediate proceedings before an administrative law judge, the Board issued the decision and bargaining order against Dynamic II that is before this Court.

## II.

In its order, the Board found that Dynamic II was obligated to bargain with the union as a successor employer to Dynamic I because of the similarity of operation of the two firms and Dynamic II's retention of all the unit employees.[4] Relying on cases establishing that the certification bar rule [5] is unaffected by normal turnover of unit employees,[6] the Board rejected Dynamic II's argument that post-election employee turnover possibly affecting the union's majority status among the unit employees should be taken into account in determining its bargaining duty as a successor employer. The Board also rejected, on the basis of *N. L. R. B. v. Burns Int'l Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), Dynamic II's argument that it need not bargain with the union certified to represent Dynamic I's

---

**3.** Two months later, Dynamic II suggested to the union that a new election be held to determine whether the union still represented a majority of the unit employees. The union declined to accept the suggestion.

**4.** The board also refused Dynamic II's request to reconsider the validity of the union certification because the issue had been fully litigated in the Dynamic I representation proceeding.
   We, of course, are not prevented from reviewing at this time the issues litigated in the underlying representation proceeding. 29 U.S.C. § 159(d).

**5.** The certification bar is an almost irrebuttable presumption that a union continues to hold the support of a majority of the employees in the bargaining unit for a reasonable time, usually one year, following its certification as exclusive bargaining representative. *Brooks v. N.L.R.B.,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Celanese Corp. of America,* 95 NLRB 664 (1951). The bar is designed to allow the union both to carry out its mandate without being put "under exigent pressure to produce hothouse results or be turned out," and to minimize an employer's temptation to undermine the union's strength rather than to negotiate and administer a collective bargaining agreement in good faith. *Brooks v. N.L.R.B., supra* at 100, 75 S.Ct. at 179.

**6.** E. g., *Laystrom Manufacturing Co.,* 151 NLRB 1482, 1484 (1965), *enforcement denied on other grounds,* 359 F.2d 799 (7th Cir. 1966).

employees because it purchased Dynamic I in good faith without assuming its obligations.

### III.

Dynamic II first argues to this Court that the union certification was improper because the Board erroneously found that Harry Tietz was a supervisor ineligible to vote in the representation election.

The relevant facts found by the hearing officer and not disputed by the parties are as follows:

At the time of the election, Harry Tietz was the "working foreman"[7] of Dynamic I's grinding department located in a building across the street from the main plant. He and six other employees operated 23 grinding machines of four different types. Most employees usually worked on only one type of machine, although Tietz and at least one other employee commonly operated several types. Apart from operating the machines, Tietz's major duty was to assign the work sent to the department from the main plant. As the most experienced employee, he usually took most of the difficult and rush jobs himself, and assigned the more routine work and the difficult or rush work he could not perform to the other employees. In assigning the work, he took into account each employee's relative abilities, workloads and familiarity with the appropriate machine for the job. After assignment, the employee ran the job without Tietz's supervision.

Tietz's duties as foreman also included relaying employment requests for time off and wage increases to management, distributing paychecks, correcting time cards of employees who forgot to punch in, occasional consulting with management regarding the other employees' job performance, and attending management meetings where productivity and similar issues were discussed. He had no authority to hire, fire or promote his coworkers.

Apart from the above, Tietz was distinguished from the other department employees in that he received a higher wage and bonus, was paid on a salary rather than hourly basis, and was given keys to the plant. However, he worked the same hours, wore the same clothes, and used the same locker facilities as the others.

Section 2(11) of the Act, 29 U.S.C. § 152(11), provides that:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Applying this standard to the undisputed facts noted above, the hearing officer concluded that Tietz was not a supervisor because he exercised no independent judgment in assigning work, the principal supervisory-type task listed in the statute that he performed. The Board overruled the hearing officer. It found that Tietz "independently assigns and directs work" and that he provides "whatever day-to-day supervision the six employees receive" because he is "the only responsible working foreman in a physically isolated part of the employer's plant."

The parties agree that only one of the supervisory powers listed in Section 2(11) need be present for the Board to find Tietz a supervisor. *N.L.R.B. v. Brown Specialty Co.*, 436 F.2d 372, 375 (7th Cir. 1971); *N.L.R.B. v. Elliott-Williams Co.*, 345 F.2d 460, 463 (7th Cir. 1965). They concentrate their arguments on whether Tietz uses independent judgment in assigning work.

The employer argues both that the Board failed to enter a finding that Tietz exercised supervisory authority in assigning work, and that, even if such a finding was made, it is not supported by the record,

---

7. Tietz so characterized his job at the representation hearing.

which shows that Tietz's assignments were of a routine nature.

The Board replies to the first point that it entered the necessary finding in its statement that Tietz "independently assigns work" to the other departmental employees. The employer rejoins that this statement was not a sufficient basis for the Board's conclusion because it was not an explicit finding that Tietz exercised "independent judgment," as required by the statute.

We find no merit in this argument. Although the Board did not track the exact language of the statute in drafting its finding, in view of its overruling of the hearing officer and its conclusion that Tietz was a supervisor, the language it used clearly was meant to convey the concept of independent judgment.

Turning to Dynamic II's second point, the absence of support in the record for the Board's finding, we recognize that the question of whether Tietz's assignment of work involved the exercise of independent judgment is a close one. The Board believes that Tietz's assignment duties necessarily involved the exercise of independent judgment because he was required to match the nature of the job with the relative skills and availability of the different employees. Dynamic II argues that Tietz's assignments were made strictly in accordance with workshop routine. Work was assigned automatically to the employee who operated the particular machine on which the job must be run. If more than one employee could run the machine required, the job went to the first employee who needed work. If it was a priority job, or one that called for close tolerances, it went to Tietz or another trusted senior employee.

We agree with Dynamic II that the choices Tietz had in assigning work were severely circumscribed by objective factors outside his control, such as the requirements of the job and the limited skills of most of his coworkers. However, although Tietz's options were limited and only a few factors needed to be taken into account in assigning work, his assignments required the exercise of his own judgment as to the nature of the job, the level of skill needed to complete it, and the relative abilities of particular employees to do it. Whether or not such an exercise of judgment, limited as it is, is sufficient to render Tietz a supervisor is a question which we think calls into play the

"Board's special function of applying the general provisions of the Act to the complexities of industrial life." *N.L.R.B. v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963).

As we have said before, in reviewing cases involving the question of whether employees are supervisors within the meaning of the Act, we permit the Board "a large measure of informed discretion." *N.L.R.B. v. Process Corp.*, 412 F.2d 215, 218 (7th Cir. 1969); *N.L.R.B. v. American Oil Co.*, 387 F.2d 786, 788 (7th Cir. 1967). In view of this deference due the Board's practical expertise, we must respect the inference the Board drew from the record, for we do not have the power to

"displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

## IV.

Dynamic II next argues that the Board's bargaining order should not be enforced because the Board failed to balance the interests and justifiable expectations of all the parties in making its successorship determination. Dynamic relies primarily on dictum in *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 262–63, n. 9, 94 S.Ct. 2236, 2243, n. 9, 41 L.Ed.2d 46 (1974), which states that the inquiry into whether a successor employer has legal obligations to its predecessor's employees

"requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue . . . . ."

Dynamic asserts the Board failed to follow the Supreme Court's mandate when it "mechanistically applied" presumptions established in single employer cases in ordering it to bargain with the union. According to the company, the Board neglected to take into account the turnover of unit employees between the date of the election and the bargaining request, Dynamic II's expectation at the time of purchase that no certification would issue, and the long delay from the date of the election until the final Board order. Dynamic argues that, though none of these factors taken alone might require reversal of the Board's order, taken together they outweigh whatever interests are served by imposing on Dynamic II the bargaining obligation of its predecessor employer.

The Board answers that *N.L.R.B. v. Burns Int'l Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), establishes that the presumptions from single employer cases it relied on remain applicable in successorship cases. The Board rebuts, one by one, the relevance of each of the matters that Dynamic II claims excuse it, on the whole, from its predecessor's bargaining duty.

Our decision hinges on how we interpret *Burns*. In that case, Burns International Security Services outbid another employer, the Wackenhut Corporation, for the contract to provide plant protection services at the Lockheed Aircraft service plant at a California airport. Wackenhut had held the contract for the previous five years. Burns took over the security contract less than four months after a union which had recently won a representation election was certified by the Board as the exclusive bargaining representative of the Wackenhut employees.

Burns began providing services at the Lockheed plant by retaining 27 of the Wackenhut guards and reassigning 15 of its own guards from other locations. Soon thereafter, the recently certified union demanded that Burns recognize it as the bargaining representative of the Burns employees at the plant. Burns refused, and the union filed unfair labor practice charges against Burns with the Board. The Board found that the bargaining unit remained unchanged after the Burns takeover and held that Burns had a duty to bargain with the union certified to represent its predecessor's employees. The Board's bargaining order was enforced by the Second Circuit Court of Appeals, whose decision was affirmed by the Supreme Court:

> "In these circumstances, it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact." 406 U.S. 279, 92 S.Ct. at 1577.

The Court drew support for its holding both from the National Labor Relations Act's proscription against conducting representative elections within the year following a valid election and from cases holding that the "certification bar," which compels an employer to bargain with a union for a reasonable period, usually one year, following the union's certification, applies in the successor employer context as well as in the single employer context:

> "Burns' obligation to bargain with the union over terms and conditions of employment stemmed from its hiring of Wackenhut's employees and from the recent election and Board certification. It has been consistently held that a mere change of employers or of ownership in the employing industry is not such an 'unusual circumstance' as to affect the force of the Board's certification within the normal operative period if a majority of employees after the change of ownership or management were employed by the preceding employer.[3]

[3] Cf. § 9(c)(3) of the NLRA, 29 U.S.C. § 159(c)(3), which provides that '[n]o election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period a valid election shall have been held.'

> Where an employer remains the same, a Board certification carries with it an almost conclusive presumption that the majority representative status of the union continues for a reasonable time, usually a year." 406 U.S. at

278–79, 92 S.Ct. at 1577–1578 (citations omitted).

The Court went on to emphasize that its decision would have been different if Burns' operational structure and practices had differed markedly from those of its predecessor or if Burns had not hired employees already represented by a certified union. *Id.* at 280, 92 S.Ct. 1571.[8] In conclusion, the Court stated:

"[W]here the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's implementation of the express mandates of § 8(a)(5) and § 9(a) by ordering the employer to bargain with the incumbent union. This is the view of the several courts of appeals, and we agree with those courts." 406 U.S. at 281, 92 S.Ct. at 1579. (citations omitted).

We glean from *Burns* at least two principles pertinent to the case at hand: (1) that the certification bar doctrine applied in single employer cases retains validity in successor employer cases; and (2) that a mere change in employers does not constitute "unusual circumstances" sufficient to rebut the presumption of a union's continuing majority status created by the certification bar, at least so long as the successor employer hires a majority of its predecessor's employees[9] and preserves substantially intact its predecessor's operational structure and practices.

The dictum in *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 262–63 n. 9, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), relied upon by Dynamic II, does not mandate a retreat from either of these principles or the method of analysis used in *Burns.* The Court's statement reads in full:

"[T]he real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others." *Id.* at 262–63 n. 9, 94 S.Ct. at 2243 n. 9.

Dynamic contends that the Court's reference to an "analysis of the interests . . . in light of the facts of each case" means that each successorship case must turn on a balancing of the interests and expectations of the affected parties and the public presented by the facts of each particular case. Accordingly, Dynamic says the balance of interests struck, and the presump-

8. The court also suggested, in a footnote, another circumstance that might have changed its decision:

"If there is a change of employers, however, and an almost complete turnover of employees, the certification may not bar a challenge if the successor employer is not bound by the collective-bargaining contract, particularly if the new employees are represented by another union." 406 U.S. 279, n. 3, 92 S.Ct. at 1578, n. 3.

The instant case clearly falls outside this possible exception to a successor's bargaining duty because 16 of the 31 employees employed by Dynamic II at the time of the bargaining request had voted in the representation election. Being under fifty percent of the unit employees, the turnover here is a far cry from the "almost

complete turnover" mentioned in *Burns* as triggering the exception. Moreover, the new employees were not already represented by a union, nor was the old unit ruled an accretion onto another.

9. Subsequent cases have questioned whether a successor need hire a strict majority of its predecessor's employees to meet this test, or whether a "substantial number" of employees is sufficient. *Boeing Co. v. International Ass'n of Machinists*, 504 F.2d 307, 317–18, 320–21 (5th Cir. 1974); *Spruce Up Corp.*, 209 NLRB No. 19 (1974). This issue does not arise in the instant case because a majority of Dynamic II's employees were formerly employed by Dynamic I and were members of the bargaining unit that participated in the representation election.

tions relied on, in *Burns* need not be deemed controlling here, where the facts differ. In effect, Dynamic II reads the Court's dictum in *Howard Johnson* as directing us to ignore the principles established in *Burns* anytime we are presented with a factually distinguishable successorship case involving the duty to bargain.

We believe the Court's references to "an analysis of the interests . . . in light of the facts of each case" must be read in concert with its reference to the "particular legal obligation . . . at issue" and its suggestion that an employer "may be a successor for some purposes and not for others." When so read, it becomes apparent that the Court is saying that the analysis that must be undertaken in one type of successorship case, such as one involving the duty to bargain, may differ substantially from the analysis undertaken in another type of successorship case, such as one involving a successor employer's duty to arbitrate disputes under a collective bargaining agreement entered by its predecessor. We do not believe that the Court is saying that, once particular principles or presumptions are deemed relevant to determine whether a successor employer is required to perform a particular obligation of its predecessor, those principles or presumptions may be disregarded whenever the same obligation is at issue in a subsequent successorship case whose underlying facts differ from the precise facts presented in prior cases. Thus, we do not read the Supreme Court's statement in *Howard John-*

*son* as suggesting the analysis the Court used in *Burns* is no longer appropriate for deciding whether successor employers have a duty to bargain with their employees.[10]

*Burns* refines from the mass of "successorship" cases the key elements and principles relevant to determining whether a predecessor's bargaining duty should be imposed on a successor employer. By relying more on presumptions and precedent than on a *de novo* balancing of the interests arising out of each factual situation, the Board and the courts are not ignoring the equities, as Dynamic II contends, but are considering them through more focused lenses. This method of analysis represents a progressive step in the development of this area of law because it serves important policies of uniformity and predictability of decision-making that were, for the most part, neglected in the past. See Slicker, *A Re-Consideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach*, 67 Minn.L.Rev. 1051, 1063, 1102–04 (1973).

## V.

Applying the *Burns* analysis to the case at hand, we first note the presence of the two elements emphasized in *Burns* —the continuation by the successor of its predecessor's operations and practices,[11] and the successor's hiring of a majority of the employees in its predecessor's bargaining unit.[12]

---

**10.** Lower courts, including this court, concur in the view that *Burns* approves the Board's use of presumptions normally applied in a single employer context in cases involving a successor employer's duty to bargain. See *Zims Foodliner v. N.L.R.B.*, 495 F.2d 1131, 1138–42 (7th Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974); *N.L.R.B. v. Bachrodt Chevrolet Co.*, 468 F.2d 963, 967–68 (7th Cir. 1972), *vacated and remanded on other grounds*, 411 U.S. 912, 93 S.Ct. 1547, 36 L.Ed.2d 304 (1973); *N.L.R.B. v. Band-Age Inc.*, 534 F.2d 1, 4–5 (1st Cir.), *cert. denied*, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976); *N.L.R.B. v. Wayne Convalescent Center*, 465 F.2d 1039, 1043 (6th Cir. 1972); *N.L.R.B. v. Denham*, 469 F.2d 239, 244 (9th Cir. 1972), *vacated and remanded on other grounds*, 411 U.S. 945, 93

S.Ct. 1925, 36 L.Ed.2d 407 (1973); *N.L.R.B. v. Geronimo Service Co.*, 467 F.2d 903, 904 (10th Cir. 1972); accord, *Spruce Up Corp.*, 209 NLRB No. 19, 95 LRRM 1426 (1974), *enf'd* 90 LRRM 2525 (4th Cir. 1975).

**11.** The stipulation of facts presented to the Board establishes that Dynamic II made no significant changes in the operation and practices of Dynamic I's business. As previously discussed, the employees faced essentially the same working conditions under both employers, and the bargaining unit was identical.

**12.** Dynamic II started operations by retaining all 30 employees in Dynamic I's bargaining unit.

Given the presence of these elements, the certification bar rule imposes on Dynamic II a duty to bargain with the union for the year following its certification, absent "unusual circumstances". *Burns, supra* at 279, 92 S.Ct. 1571.

■ To determine what may constitute "unusual circumstances" sufficient to negate Dynamic II's duty to bargain, we must, as the *Burns* Court did, look to cases in the single employer context. The primary case speaking to this issue relied on in *Burns* mentioned three circumstances as being sufficient to rebut the presumption of a union's continued majority status for one year following its certification:

> "(1) the certified union dissolved or became defunct; (2) as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international; (3) the size of the bargaining unit fluctuated radically within a short time."
> *Brooks v. N.L.R.B.,* 348 U.S. 96, 98–99, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954).

Only circumstances of comparable magnitude can overcome the certification bar when it is applied, as in *Burns*, to successor employers who hire a majority of their predecessor's employees and continue their predecessor's operations and practices.

Dynamic II presents us with several circumstances that it claims negate any bargaining duty it may have. We find none of them to be of sufficient magnitude to overcome the application of the certification bar rule to this case.

■ Dynamic II primarily argues that the combination of the close representation election and the turnover of approximately one-half of the voting employees in the unit between the election and the bargaining request created sufficient doubt about the union's continued majority status at the time of the bargaining request to excuse Dynamic's failure to bargain. In light of this turnover, Dynamic II argues that it would be contrary to the interests of its present employees to force them to accept the union's representation without conducting another representation election.

This very argument, however, was raised by the dissenting Justices in *Burns* and implicitly rejected by the majority's holding. In *Burns*, the successor employer was obligated to bargain with a union that had been selected in an election involving, at most, 27 of the 42 employees retained by the successor employer.[13] 406 U.S. at 275, 92 S.Ct. 1571. Here, 18 of the 31 employees employed by Dynamic II when the union formally demanded recognition had voted in the election. The slightly greater percentage of employee turnover in the instant case is not significant enough to distinguish this case from *Burns*.

Moreover, a similar argument was rejected by this court in *N.L.R.B. v. Bachrodt Chevrolet Co., supra,* at 968, where we held:

> "When, as here, there is at least a prima facie showing that the union represented a majority of the employees within a year of the change in ownership, it must be presumed that the union's status continued beyond the changeover." Cf. *Zims Foodliner, Inc., supra* note 10, at 1138,. 1141.

The employee turnover factor, thus, cannot constitute an unusual circumstance that excuses Dynamic II's bargaining duty.

■ Dynamic II next argues that it should not be required to bargain with the union because it purchased Dynamic I without notice or knowledge of the union's certification, which occurred after the sale. This contention is belied by the facts. Dynamic II purchased Dynamic I after the hearing officer had issued his report overruling three of the union's ballot challenges, and before the Board had ruled on the parties' exceptions to the hearing officer's report. Dynamic II argues that it believed at the time of purchase that the certification would not issue because it assumed the

---

**13.** The *Burns* opinion does not specify how many of the 27 Wackenhut employees hired by Burns voted in the election.

hearing officer's report would be sustained by the Board, and thus the three ballots challenged by the union would be opened and would cause a tie election.

Whatever the validity of such assumptions, Dynamic II was not unaware that the union might be certified by the Board after the purchase. Certainly Dynamic's own reliance on what proved to be erroneous assumptions cannot now be used as a shield to excuse its duty to bargain with the union.[14]

■■■ Finally, Dynamic II argues that the Board should not have issued its bargaining order because the long delay from the date of the election until the Board's bargaining order, due to Board proceedings, has created a substantial doubt as to whether the unit employees still desire the union to represent them. To be sure, the election occurred almost three years ago, but such delay is not uncommon in cases such as this, and this Circuit has expressly ruled that such post-election delay cannot preclude enforcement of a bargaining order. *N.L.R.B. v. Copps Corp.*, 458 F.2d 1227, 1230–31 (7th Cir. 1972); *N.L.R.B. v. Henry Colder Co.*, 447 F.2d 629, 630 (7th Cir. 1972); *N.L.R.B. v. Kostel Corp.*, 440 F.2d 347, 353 (7th Cir. 1971).

We reiterate our reasoning in *Copps*: " '[L]ater events should not be permitted to preclude enforcement, since the delay is "the unfortunate but inevitable result of the process . . . prescribed in the Act.' " *Kostel*, 440 F.2d at 353. . . To hold otherwise would put a premium on delay and procrastination by the company in complying with the Board's order."[15] 458 F.2d at 1231.

We adhere to our prior views that delay due to Board proceedings cannot be used to excuse Dynamic II's duty to bargain with its employees.

Having shown no unusual circumstances significant enough to overcome the presumption of the union's continuing majority status arising from its recent certification, Dynamic II was properly found to have a duty to bargain with the union.

ENFORCED.

14. *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), cited by Dynamic II for the proposition that a successor employer is bound only by legal obligations it was aware of at the time of purchase, does not require a contrary conclusion because Dynamic II was aware when it purchased the business that the union might be certified. The possibility of certification was a matter that could have been reflected in the price paid for the business. *Id.* at 185, 94 S.Ct. 414.

15. *Clark's Gamble Corp. v. N.L.R.B.*, 422 F.2d 845 (6th Cir.), *cert. denied*, 400 U.S. 868, 91 S.Ct. 100, 27 L.Ed.2d 108 (1970), the principal case relied on by Dynamic II in its post-election delay argument, was expressly rejected by this Circuit in *N.L.R.B. v. Henry Colder Co.*, *supra* at 630 n. 2. A later case, *N.L.R.B. v. Caravelle Wood Products, Inc.*, 466 F.2d 675, 679 (7th Cir. 1972), distinguished *Clark's Gamble Corp.* on the ground that the elements compelling the Sixth Circuit to deny enforcement in *Clark's Gamble* were not present, *i. e.*, a delay occasioned primarily by Board inaction of more than five years after a majority determination based on union authorization cards. We need not decide whether *Caravelle Wood Products* signals the renewed vitality of the *Clark's Gamble* doctrine in this Circuit because none of the exceptional circumstances present in *Clark's Gamble* are present in the instant case.