**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JARM ENTERPRISES, INC., d/b/a Blu-Fountain Manor, Respondent.**

No. 85–1067.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1985.

Decided March 4, 1986.

Ellen Boardman, Appellate Court Branch, N.L.R.B., Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Elton L. French, St. Louis, Mo., for respondent.

Before FLAUM and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.*

FLAUM, Circuit Judge.

This appeal is before the court on an application for enforcement of a decision and order of the National Labor Relations Board ("the NLRB") and a cross-petition for review filed by Jarm Enterprises ("Jarm"). This dispute arose out of Jarm's purchase of a nursing home which was operating with replacement employees while its represented employees were striking for higher wages. By refusing to bargain with the union representing the nursing home's striking employees and by refusing to rehire the strikers, Jarm became enmeshed in an unfair labor practice proceeding before the NLRB. The Board ruled against Jarm issuing an order requiring bargaining, reinstatement, and backpay, and the present appeal was commenced. Before this court Jarm raises a number of issues concerning its status as a "successor" employer, the continued vitality of the union's role as a representative of the employees, its liability for the prior employer's replacement of striking employees and conduct of labor negotiations, and the appropriateness of the relief ordered. Finding that the administrative record adequately supports the NLRB's conclusions, we affirm.

I

This dispute arose out of Jarm's purchase of the Blu-Fountain Manor nursing home in Godfrey, Illinois from Fountainhead Development Corporation ("Fountainhead") on April 29, 1981. Since July 1, 1980 the United Food and Commercial

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

Workers Union, Local 35, affiliated with the United Food and Commercial Workers International Union, AFL–CIO–CLC ("the Union"), had been the exclusive bargaining representative of a unit encompassing Fountainhead's employees. After certification the Union commenced collective bargaining negotiations which did not prove to be fruitful. The Union directed the employees to go on strike on October 14, 1980. This action continued until Jarm assumed control in May of 1981.

The strike began as an "economic" strike, a labor action designed to achieve an increase in benefits. However, according to the NLRB, certain activities in early 1981 transformed the strike into an unfair labor practice strike. On January 27, 1981, the Union, claiming that Fountainhead had asserted an inability to afford wage increases, demanded the right to examine the company's financial records. Approximately two weeks later Fountainhead refused to allow the Union access on the grounds that the company, in its view, never presented an inability to pay argument during any bargaining session. The Union responded by filing unfair labor practice charges against Fountainhead. These charges were dismissed by the Regional Director and subsequently appealed to the NLRB along with the Union's subsequent claims against Jarm.

Acting pursuant to its belief that the strike was economic, Fountainhead exercised its right to hire strike replacements. The record does not indicate whether the striking employees were replaced before or after the character of the strike allegedly changed on February 8, 1981. The NLRB concluded that the timing of the hiring of replacements was irrelevant since the absence of an actual discharge of the strikers prevented the replacements from being considered "permanent strike replacements."

This was the context which Jarm entered by exercising its option to purchase the Blu-Fountain Manor nursing home on May 1, 1981. Upon assumption of ownership Jarm immediately retracted the package of employee benefits provided by Fountainhead and rehired under new terms the Fountainhead employees working at the time of transfer of ownership, including the striker replacements. On May 8, 1981 the Union contacted Jarm and presented an unconditional offer to return to work and a request to commence collective bargaining. Jarm refused both submissions on the grounds that as a new employer it was not subject to the labor relationships established by Fountainhead and that the Union could not be deemed to represent the existing contingent of employees at the nursing home. The refusal to rehire any of the strikers was not attributable to an inability to find available positions since the record indicates that in the months following the takeover Jarm either filled vacancies or advertised for enough positions such that they could have, if they wished, reemployed the strikers.

The Union filed unfair labor practice charges against Jarm. These charges were consolidated with the preexisting claims against Fountainhead, which had been revived on appeal from the Regional Director's decision, and presented before an administrative law judge. The ALJ found for the Union with regard to all issues and the NLRB sustained that decision.

The NLRB's decision as it relates to Jarm (Fountainhead did not seek review or refuse to comply with the order) relies on three related conclusions. First, the Board concluded that Jarm was a "successor" to Fountainhead. Jarm's contention that it was "radically different" enterprise was rejected. Second, as a successor Jarm was held to be subject to a duty to bargain with the exclusive bargaining representative of its predecessor. Since the Union was still within the one-year certification bar to challenges to its majority support at the time of the takeover, Jarm violated sections 8(a)(5) and derivatively 8(a)(1) of the NLRA. Third, the NLRB found that Jarm committed an unfair labor practice by failing to rehire the striking employees for the dual reasons that (1) Jarm refused rein-

statement on the basis of anti-union animus and (2) Jarm, as a successor with knowledge, acquired Fountainhead's obligation to reinstate unfair labor practice strikers. Implicit in this final reason is that Fountainhead transformed the nature of the strike by committing an unfair labor practice through its refusal to reveal financial information.

In crafting a remedy with respect to Jarm it was held that Jarm purchased the nursing home with knowledge of the unfair labor practices alleged against Fountainhead. Under these circumstances Jarm was deemed to be in a position in which it could be held responsible for the violations attributable to its predecessor. Therefore the NLRB required Jarm to reinstate all striking employees with backpay starting from May 8, 1981, the date the Union unequivocally offered to end the walkout, and ordered the company to commence collective bargaining with the Union. Jarm refused to comply and the NLRB brought an enforcement action in this court. Jarm cross appealed for purposes of challenging the Board's determination.

II

This appeal hinges on the resolution of two interrelated issues. The first centers on Jarm's status as a successor under *NLRB v. Burns International Securities Services*, 406 U.S. 272, 275, 92 S.Ct. 1571, 1576, 32 L.Ed.2d 61 (1972), and its progeny. If there is a substantial continuity between Jarm and Fountainhead there is the potential for Jarm to be deemed to have acquired certain labor obligations of its predecessor. The second issue, which is contingent on affirming the NLRB on the first, relates primarily, but not entirely, to activities that occurred prior to the sale of Blu-Fountain Manor. Jarm's argument against rehiring the striking employees is based on establishing that Fountainhead's refusal to provide financial records did not convert the strike into an unfair labor practice strike where reinstatement would be required. Furthermore, the argument that the strikers were legally terminated is central to

Jarm's claim that the lack of represented employees at the time of the takeover constituted unique circumstances that prevent application of the NLRB's one-year certification bar rule.

Appellate review of the labor board's actions is limited. "Factual findings supported by substantial evidence in the record as a whole are conclusive." *International Union of Operating Engineers v. NLRB*, 755 F.2d 78, 81 (7th Cir.1985) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). In *Operating Engineers* substantial evidence was held to exist where "the record contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" 755 F.2d at 81 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). *See also Bloomer Shippers Assoc. v. ICC*, 679 F.2d 668, 672 (7th Cir.1982). On the record before this court the NLRB did not commit reversible error in finding that Jarm had a duty to bargain with the Union and the obligation to reinstate the striking employees.

### A. Jarm's Obligations Under the Successorship Doctrine

■ The threshold issue in this appeal is Jarm's status as a successor. From this status stems any possible obligation for its predecessor's duty to bargain and unfair labor practices. As a successor an employer is deemed to be operating, from the employees' perspective, the same entity as the previous employer, thus justifying an assumption that the change in ownership has not affected employee attitudes towards union representation. *See NLRB v. Burns International Securities Services*, 406 U.S. 272, 275, 278–80, 92 S.Ct. 1571, 1576, 1577–78, 32 L.Ed.2d 61 (1972); *Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201–03 (7th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 463–64 (9th Cir.1985). Therefore the successorship inquiry revolves around the question of "whether there has been an

essential change in the business that would have affected employee attitudes toward representation." *Premium Foods v. NLRB,* 709 F.2d 623, 627 (9th Cir.1983). *See also NLRB v. Hudson River Aggregates,* 639 F.2d 865, 869 (2d Cir.1981); *International Union of Electrical Workers v. NLRB,* 604 F.2d 689, 694 (D.C.Cir.1979); *NLRB v. Boston Needham Industrial Cleaning Co.,* 526 F.2d 74, 77 (1st Cir. 1975).

■ The NLRB in *Premium Foods,* 260 NLRB 708, 714 (1982), *enforced,* 709 F.2d 623, 629 (9th Cir.1983), enunciated a non-exhaustive list of the factors relevant in determining successorship, including whether:

> [a] there has been a substantial continuity of the same business operations; [b] the new employer uses the same plant; [c] the same or substantially the same work force is employed; [d] the same jobs exist under the same working conditions; [e] the same supervisors are employed; [f] the same machinery, equipment, and methods of production are used; and [g] the same product is manufactured or the same service [is] offered
> . . .

206 NLRB at 714. *See also Jeffries Lithograph,* 752 F.2d at 463. There is, and can never be, however, a formal definition of a successor. Factors can be identified, as the NLRB has done, but the determination in each case involves the facts and the labor policy at issue. *See Howard John-*son Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 262, 94 S.Ct. 2236, 2243, 41 L.Ed.2d 46 (1974).[1] Thus a finding that there has been no significant change in the enterprise from an employee perspective does not necessarily translate into a duty to bargain with the union or liability for a predecessor's unfair labor practices.

■ Jarm has proposed an exhaustive list of changes that it claims establish that Blu-Fountain Manor is a radically new enterprise under its current management. These substantial changes include: (1) the withdrawal from Medicare and Title 19 skilled care programs; (2) the abandonment of previous personnel policies in favor of Jarm policies; (3) the creation and elimination of certain supervisory positions and job classifications; (4) the introduction of a new computerized billing and accounting system; (5) the renovation of the doors, the sprinkler system, and the storage area at a cost of $60,000. The ALJ summarily concluded that the changes were not substantial enough to remove Jarm from the successor doctrine. A review of the administrative record demonstrates that there is substantial evidence for the NLRB's conclusion that generally speaking Jarm was a successor in the absence of countervailing policy considerations that may exist in this particular setting.

Most of the evidence that Jarm presents reveals only basic cosmetic modifications of the physical and organizational structure.[2]

---

1. The Court in *Howard Johnson* stated:

 The question whether Howard Johnson is a "successor" is simply not meaningful in the abstract. Howard Johnson is of course a successor employer in the sense that it succeeded to operation of a restaurant and motor lodge formerly operated by the Grissoms. But the real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative. The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the Union, the duty to remedy unfair labor practices, the duty to arbitrate,

 etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

 417 U.S. at 262, 94 S.Ct. at 2243.

2. *Cf. Tom-A-Hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1027 (7th Cir.1969) (successor status found where wages and benefits differed and new bus routes, schedules and fares implemented but where basic operations and services remained the same); *NLRB v. Middleboro Fire Apparatus Inc.,* 590 F.2d 4, 8 (1st Cir.1978) (successor status found where new employer did more "refurbishing" of equipment than predecessor and planned "to expand into manufacturing" but where "projects continue[d] to use essentially the same skills & tools"); *NLRB v.*

To the extent changes of substance were made, the overriding aspect of the acquisition by Jarm was the continuity of identity of the work force. Jarm hired *en masse* all of the employees of the nursing home as of the time of the takeover. *See, e.g., Howard Johnson Co.*, 417 U.S. at 263, 94 S.Ct. at 2244; *NLRB v. Wayne Convalescent Center, Inc.*, 465 F.2d 1039, 1041 (6th Cir. 1972) ("the hiring of a large portion of the predecessor's employees is persuasive in finding successorship status"). *See also Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1204 (7th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977).

Jarm attempts to bolster its argument that it was not a successor bound to recognize the Union by claiming that while it did hire all of Fountainhead's employees at the nursing home these people were largely strike replacements who could not be deemed to support the Union.[3] Whatever intuitive appeal this argument may have, it is unpersuasive because it assumes away the core of the dispute. Jarm ignores the questions of (1) whether the striking employees remained part of the bargaining unit by virtue of Fountainhead's activity and thus were entitled to priority to employment over the replacements; and (2) whether the one-year certification bar rule prevents Jarm from contesting the Union's

support among the nursing home's employees. Thus, the ALJ's summary treatment of the continuity of enterprise issue was supported by the record. Jarm's "new business" claim relying on the strike replacement work force should not be used to distract attention from the salient fact that unlike *Howard Johnson*, a case heavily relied on by Jarm, the transaction here involved simply a transfer of ownership, not a substantial revamping of organizational structure where either a small percentage of the predecessor's employees were hired or the modifications in operations resulted in an undermining in attitudes toward representation.

### B. Duty to Reinstate Striking Employees

■ The NLRB offered two justifications for ordering Jarm to reinstate the strikers. The first rationale was that Jarm's refusal to rehire the strikers was motivated by anti-union animus and was thus in violation of sections 8(a)(1) and 8(a)(3) of the NLRA. The prime evidence of animosity was Jarm's insistence on not hiring the former striking employees despite a substantial number of openings in the months following the purchase. There is no *direct* evidence of any anti-union animosity. As Jarm correctly points out,

---

*Band-Age Inc.*, 534 F.2d 1, 6 (1st Cir.), *cert. denied*, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976) (successor status found where, despite the production of a somewhat different product, "most of its employees were doing the same jobs they had performed previously"); *NLRB v. Polytech, Inc.*, 469 F.2d 1226, 1230–31 (8th Cir.1972) (successor status found where, despite the discontinuation of some of predecessor's products—which did not demonstrate that "essential nature of the enterprise" had changed—new employer continued in the same industry).

**3.** Jarm also relies on dicta from *Burns Security Service* where the Court stated that the case "would be different if Burns had not hired employees already represented by a union certified as a bargaining agent." This argument begs the question by assuming that the striker replacements are not "deemed" to support the Union and that the striking employees are effectively and permanently discharged.

As an additional point Jarm argues that there was no finding that the bargaining unit at the

nursing home under Fountainhead was appropriate after Jarm's takeover. It is argued that the administrative law judge misunderstood a stipulation by Jarm as to the scope of the unit certified for Fountainhead by finding that the parties stipulated to the appropriateness of the bargaining unit. While the transcript of the hearing evidences the source of any possible confusion, Jarm is not completely wrong in stating that it did not make the stipulation for which it is credited. Even without the stipulation, however, there are, as noted by the administrative law judge, adequate facts in the record to affirm the finding of successorship. If, as Jarm conceded, the unit was appropriate for Blu-Fountain Manor under Fountainhead and it is established that no substantial changes were made by Jarm there is no reason to doubt that the change in ownership did not alter the proper unit. This is particularly persuasive where the existing unit is limited to a specific facility rather than firm-wide.

drawing an inference of animus from hiring practices alone is particularly troublesome where a successor purchases based on a belief, albeit erroneous, that recent events have rendered the enterprise non-unionized and where the former strikers were involved in an occasionally violent labor action. While intent can be proved circumstantially, *see NLRB v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1136–37 (7th Cir.1983), courts have required more than the failure to hire union people for available positions. *See, e.g., Industrial Erectors*, 712 F.2d at 1137 ("Among the factors the Board may consider in determining whether there were discriminatory discharges are a record of *manifest* hostility toward unionization, combined with knowledge of the discharged employees' union activity; coincidence in time between the employees' union activity and their discharges; good work records of discharged employees; and implausible or shifting explanations for the discharges.") (emphasis added). *See also NLRB v. Town & Country LP Gas Service Co.*, 687 F.2d 187, 192 (7th Cir.1982). The record here does not establish a prima facie case against Jarm of hiring based on anti-union animus.

■ The second rationale for imposing a reinstatement obligation on Jarm, however, is more persuasive. A successor with notice of an existing unfair labor practice charge against the predecessor can be held accountable for remedying these past wrongs. *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182–86, 94 S.Ct. 414, 424–26, 38 L.Ed.2d 388 (1973) (approving principles announced in *Perma Vinyl Corp.*, 164 NLRB 968 (1967), *enforced sub nom., United States Pipe & Foundry Co. v. NLRB*, 398 F.2d 544 (5th Cir.1968)). The basis for this principle is not focused on the conduct of the successor but rather the need to prevent mere changes in the title to the business from frustrating the national labor policy of remedying unfair labor practices. *See generally Golden State Bottling Co.*, 414 U.S. at 174–86, 94 S.Ct. at 420–26. Thus Jarm can be found to have committed an unfair labor practice by refusing to rehire the workers if the actions of Fountainhead created a right to reinstatement which Jarm was derivatively obligated to fulfill.

■ When a strike starts as or becomes an unfair labor practice strike, a labor action in response to the proscribed activities of the employer, the striking employees are entitled to immediate reinstatement whenever they so request regardless of whether permanent strike replacements have been hired.[4] *See Griffin Pipe Division v. NLRB*, 320 F.2d 656, 659 (7th Cir. 1963); *NLRB v. Top Manufacturing*, 594 F.2d 223, 225 (9th Cir.1979); *NLRB v. Pope Maintenance Corp.*, 573 F.2d 898 (5th Cir. 1978). A successor with notice of the unfair labor practice can be subject to the duty to rehire under the principles of *Gold-*

---

4. Jarm's argument that if the strike remained economic it was relieved of any obligation to rehire mischaracterizes the law. In fact the stakes are not so high: the characterization of the strike only impacts upon the dates on which Jarm should have rehired. The hiring of permanent strike replacements is permissible activity during an economic strike. *NLRB v. Cutting, Inc.*, 701 F.2d 659, 662 (7th Cir.1983) ("an employer has the right to continue business operations during a strike and presumably cannot obtain replacements for that purpose unless it offers them permanent employment"). Nevertheless, a legal economic strike (there is no allegation that this was an illegal strike) is protected activity under the NLRA. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967). This court has held that when economic strikers offer to return to work they are entitled to return unless the employer provides a legitimate business reason. *Laidlaw Corp. v. NLRB*, 414 F.2d 99, 103 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). The returnees, unlike unfair labor practice strikers, however, are not given priority over permanent strike replacements but are entitled to any openings that develop after the termination of the strike. *Laidlaw*, 414 F.2d at 103–04. Thus, Jarm as a successor had an obligation to rehire the strikers because under *Laidlaw* they remained "employees" of a business in which the successor hired all existing employees. Since the record indicates that openings existed in the months following the strike, Jarm committed an unfair labor practice by refusing to rehire the strikers. Therefore, the unfair labor practice issue is relevant only to the issue of whether the backpay order can date back to the date when the return to work offer was made.

en State Bottling. *NLRB v. Fabsteel Co. of Louisiana,* 587 F.2d 689, 693 (5th Cir. 1979).

### 1. Fountainhead's Unfair Labor Practice

▪ The Union's strike against Fountainhead started as an economic strike. It was not until Fountainhead allegedly committed an unfair labor practice by asserting an inability to pay and then refusing to give the Union access to its books that the character of the strike was deemed to be transformed. In order to comply with the duty to bargain in good faith under Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), an employer must furnish information necessary for a union to discharge intelligently its duties as bargaining agent. *NLRB v. Truitt Manufacturing Co.,* 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956). The key issue in disclosure of information cases is relevancy, and financial information becomes relevant whenever the employer asserts a financial inability to meet union demands. *See Truitt Manufacturing,* 351 U.S. at 152, 76 S.Ct. at 755; *Tony's Meat, Inc.,* 211 NLRB 625, 626 (1974) (employer who claims inability to pay must provide information which allows "the Union to intelligently determine whether the [employer] was making its best offer."); *Stanley Building Specialties Co.,* 166 NLRB 984 (1976).

▪ With regard to Fountainhead's conceded refusal to provide financial information this question comes down to a credibility contest between various witnesses over whether Fountainhead actually asserted an inability to pay. The Board resolved these credibility determinations in favor of the Union. Both parties devote extensive portions of their briefs to arguing over who made what comment and what was actually meant by various statements. Jarm is essentially requesting this court, on the basis of briefs and a cold record, to reevaluate the credence and weight that should be given to testimonial evidence of whether or not Fountainhead claimed an inability to pay. This is not the role of an appellate court. These types of credibility determinations "will not be overturned by a reviewing court absent extraordinary circumstances." *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 687 (7th Cir. 1982). In *Medline Industries, Inc. v. NLRB,* 593 F.2d 788, 795 (7th Cir.1979), "extraordinary circumstances" were described as a "complete disregard for sworn testimony, coupled with a tongue in cheek characterization of those utterances." In this case, the ALJ and the Board gave specific and thoughtful reasons for crediting the testimony of the Union officials over that of Fountainhead's officers.

> It should also be noted and pointed out that the credited testimony and facts found in this Decision are based on the record as a whole upon my observation of the witnesses. The credibility resolutions herein have been derived from a review of the entire testimonial records and exhibits with due regard for the logic of probability, the demeanor of the witnesses and the teaching of *N.L.R.B. v. Walton Manufacturing Company,* 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). As to those witnesses testifying in contradiction to the findings herein, their testimony has been discredited, either as having been in conflict with the testimony of credible witnesses or because it was in and of itself incredible and unworthy of belief. As has been frequently indicated in these types of cases—the ultimate choice between conflicting testimony rests on the *demeanor* of the witnesses, the weight of the evidence, the established or admitted facts, the inherent probabilities, the reasonable inferences drawn from the incidents and events, and in sum, all of the other variant factors which a trier of fact must consider in resolving credibility.

On this record Jarm has presented nothing that would seriously undermine this court's confidence in the agency's determination that Fountainhead committed an unfair labor practice.

### 2. Conversion of the Economic Strike

▪ The mere fact that an unfair labor practice was committed during the course

of a strike does not automatically transform the action into an unfair labor practice strike. This transformation is contingent on the employer's activities serving to "aggravate or prolong the strike." *Vulcan Hart Corp. v. NLRB*, 718 F.2d 269, 276 (8th Cir.1983). *See also NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 840 (5th Cir.1978) ("The employer's unfair labor practice need not be the sole or even the major cause or aggravating factor of the strike; it need only be a contributing factor."). The NLRB concluded that Fountainhead's failure to bargain in good faith prolonged the strike and this inference will be sustained if supported by "substantial evidence on the record as a whole." *NLRB v. Colonial Haven Nursing Homes, Inc.*, 542 F.2d 691, 704 (7th Cir.1976).

This is not the classic example of strike conversion where the unfair labor practice becomes an issue that further motivates the strikers. *Cf. Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1079–82 (1st Cir.1981) (no evidence that unfair labor practice prolonged strike where it had no impact on bargaining and was not part of striker's protests). *See also Colonial Haven*, 542 F.2d at 704–06. There is no evidence that the refusal to provide financial information ever became an issue among the strikers. The ALJ did find, however, that Fountainhead's actions precluded the Union from evaluating the employer's position, as well as its own, and thus precluded meaningful bargaining which could have expedited settlement of the wage dispute. In fact, the record reveals that the refusal to reveal financial data resulted in a cessation of all bargaining.

 The primary motivation of the strike appears to be the failure to make any progress on the wage increase issue. If this failure can be attributed to a hardline bargaining position taken by Fountainhead, as Jarm contends, then the strike would remain economic. *Soule Glass*, 652 F.2d at 1082 (adamant insistence on a position does not equal bad faith); § 8(d) of the Act, 29 U.S.C. § 158(d) (the duty to bargain in good faith "does not compel either party

to agree to a proposal or require the making of a concession"). However, Fountainhead's bargaining can be characterized as bad faith on the basis of its position with regard to the financial information. Bad faith bargaining which precludes settlement of an economic strike can serve to convert the strike into an unfair labor practice action. *See NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1349 (9th Cir. 1978). Given the evidence that the Union was willing to arbitrate and the conclusion of the ALJ that the bargaining history and testimony established that the Union was willing to make meaningful concessions if necessary, there is sufficient evidence to support the inference that Fountainhead's unfair labor practice substantially lengthened the strike. This evidence also supports a conclusion that the strike was in part "caused" by what was revealed to be the employer's bad faith bargaining.

### 3. Remedial Relief Against Jarm

 The foregoing analysis establishes a right to reinstatement against Fountainhead. For this obligation to extend to Jarm it must be determined that Jarm is a successor for these purposes. *See Howard Johnson*, 417 U.S. at 262, 94 S.Ct. at 2243. As discussed in Part II, there is no basis for disturbing the NLRB's conclusions regarding the continuity of the enterprise. Successor liability for past unfair labor practices, however, requires more than continuity of operation; the Board must evaluate the facts in order to strike "a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee." *Golden State Bottling Co.*, 414 U.S. at 181, 94 S.Ct. at 423. Central to this balance in a case of derivative remedial relief is a finding that the successor had notice of the unfair labor practice. *Perma Vinyl Corp.*, 164 NLRB 968 (1967), *enforced sub nom., U.S. Pipe & Foundry Co. v. NLRB*, 398 F.2d 544 (5th Cir.1968).

Jarm does not contest the NLRB's broad discretion in the formulation of remedial relief. *See Fibreboard v. NLRB*, 379 U.S.

203, 215–16, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). In fact, the Fifth Circuit in *NLRB v. Fabsteel Co. of Louisiana,* 587 F.2d 689 (5th Cir.1979) held that the NLRB could order a successor to reinstate unfair labor practice strikers "*regardless* of the fact that permanent replacements have been hired." 587 F.2d at 693. Jarm contends that the balance of interest struck by the Board was improper since Jarm bought the nursing home unaware of the potential liability.

■ The record reveals quite clearly that Jarm's attorney was put on notice by Fountainhead prior to the close of the transaction of an appeal of the Regional Director's denial of the Union's Section 8(a)(5) claim against the nursing home. Jarm contends that this did not constitute notice since it was also informed by Fountainhead's counsel that in his opinion the claim was meritless.

This argument is unpersuasive. A party who acts in reliance upon an initial determination despite the pendency of an appeal assumes the risk that the actions may later be found to be unlawful. *NLRB v. Sav-On Drugs, Inc.,* 728 F.2d 1254, 1256 (9th Cir. 1984). Jarm was aware of the labor problems at Blu-Fountain at the time of purchase and its reliance on the future prospects of the Union's claim was misplaced. This awareness of Fountainhead's violation is further reflected in the contract of sale in which Jarm attempted explicitly to deny any obligation running from Fountainhead's collective bargaining relationship. On these facts the Board was within its discretion in finding that Jarm was under an obligation to reinstate the strikers on May 8, 1981, the date of the unconditional offer to return to work. By refusing this offer Jarm itself violated Section 8(a)(5) and is justifiably required to reinstate the strikers.

In addition to the reinstatement order, the NLRB also requested that Jarm provide backpay starting from May 8, 1981. Jarm contests the fairness of the order on the grounds that it is being required to bear the burden for its predecessor's wrongs.[5] In reality, however, the backpay remedy is limited to Jarm since it extends back only to the beginning date of Jarm's individual, albeit derivative, wrongful conduct.

### C. The Duty to Bargain with the Union

■ The majority status of a certified union is irrebutably presumed for a reasonable period, ordinarily one year after certification. *Brooks v. NLRB,* 348 U.S. 96, 98, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954). This "certification year bar" precludes a challenge to majority status in the absence of "unusual circumstances" even if a successor is involved. *Dynamic Machine Co.,* 552 F.2d 1204–05. Three circumstances that are sufficient to rebut the presumption have been identified:

> (1) the certified union dissolved or became defunct; (2) as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international; (3) the size of the bargaining unit fluctuated radically within a short time.

*Brooks,* 348 U.S. at 98–99, 75 S.Ct. at 178. Jarm does not argue and the record does not indicate that any of these circumstances exist in the instant case. While this list is not exhaustive "[o]nly circumstances of comparable magnitude can overcome the certification bar when it is applied, as in *Burns,* to successor employers who hire a majority of their predecessor's employees and continue their predecessor's operations and practices." *Dynamic Machine Co.,* 552 F.2d at 1205.

---

**5.** Jarm also claims that the omission of an indemnity clause in the contract with Fountainhead adds to the inequity of the backpay award. This argument lacks merit for two reasons. First, a party to a contract's failure to obtain adequate protection cannot be allowed to have ramifications to the national labor policy. Second, the relief ordered here does not extend liability to periods prior to Jarm's actionable wrong of failing to reinstate.

Jarm argues that a special situation in this case is the hiring of strike replacements who should not be presumed to support the Union. This contention presents an opportunity for this court to enter the fray that has developed over the continued validity of the NLRB's presumption that strike replacements support the union in the same percentage as did the strikers. *Compare NLRB v. Randle-Eastern Ambulance Service, Inc.,* 584 F.2d 720, 728 (5th Cir.1978) (presume strike replacements do *not* support the union); *National Car Rental System, Inc. v. NLRB,* 594 F.2d 1203, 1206 (8th Cir.1979) (in accord); *Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1110 (1st Cir.1981) (in accord); *with NLRB v. Windham Community Memorial Hospital,* 577 F.2d 805, 813 (2d Cir.1978) (approving Board presumption); *NLRB v. Pennco, Inc.,* 684 F.2d 340 (6th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). *See also Pennco, Inc.,* 459 U.S. at 996, 103 S.Ct. at 356 (White, J. dissenting from the denial of certiorari, joined by Blackmun, J. and Rehnquist, J.).

■ Despite Jarm's arguments this case does not require this court to deepen the existing rift between the circuits. First, the cases supporting Jarm's argument with regard to strike replacements (cases cited above) all dealt with the presumption of majority status *after* the one-year certification bar has expired. After one year the presumption can be rebutted by a showing of loss of majority status. *See National Cash Register Co. v. NLRB,* 494 F.2d 189, 193–94 (8th Cir.1974). Jarm has cited no cases where the existence of strike replacements was sufficient to overcome the certification bar rule.

Second, and more significantly, even the courts that presume strike replacements do not support the union would not apply the same rule where the loss of majority is caused by an unfair labor practice by the employer. *See Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 687, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944); *Soule Glass,* 652 F.2d at 1110. As discussed above, under these circumstances the strikers were still

employees of the nursing home at the time of the transfer and were entitled to immediate reinstatement. Thus, in light of the validity of the reinstatement order, Jarm has failed to establish that there is a reasonable doubt that a majority of the employees *properly in the unit* do not support the Union, even if strike replacements are presumed to not want representation. Since the burden is on the employer to rebut the certification bar rule's presumption, Jarm has failed to present an analysis of the employment situation that would allow the evaluation of any claim of loss of majority status. Based upon the record before this court, a record Jarm as a party had a major role in developing, this case must be viewed as a situation where a successor's improper refusal to reinstate unfair labor practice strikers is the cause of the claimed loss of majority status. Under the circumstances of this case the NLRB's bargaining order must be affirmed.

### III

For the foregoing reason the enforcement of the Board's order is granted.