855 F.2d 1174
 129 L.R.R.M. (BNA) 2138, 57 USLW 2179,
109 Lab.Cas. P 10,689
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
AQUABROM, DIVISION OF GREAT LAKES CHEMICAL CORPORATION, as
successor to Bromine Division, Drug Research,
Inc.; Tesco Chemicals, Respondent.
 No. 77-1732.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 28, 1987.
Decided Aug. 24, 1988.
 
 Lawrence Scoville, argued, Suanne Trimmer, Clark, Klein & Beaumont, Detroit, Mich., Robert Brigham, West LaFayette, Ind., for respondent.
 Bernard Jeweler, Contempt Litigation, Elliott Moore, Paul Spielberg, Deputy Associate Gen. Counsel, William Bernstein, Karen Cordry, argued, N.L.R.B., Washington, D.C., Kathy L. Krieger, P. Eveleth, for petitioner.
 Before JONES, WELLFORD and GUY, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 This seemingly endless labor dispute has now managed to reach this court in one form or another for the fourth, and we hope, final time. The current posture of the case is essentially the same as it was three years ago when the case was last before us. Specifically, the National Labor Relations Board ("Board") seeks to have respondents Aquabrom, Division of Great Lakes Chemical Corp. and Tesco Chemical, Inc., a wholly owned subsidiary of Great Lakes Chemical Corporation (collectively referred to as "Great Lakes" or "the Company"), as successors to the Bromine Division of Drug Research, Inc. ("Bromine"), held in civil contempt for failing to comply with this court's May 23, 1980 judgment, enforcing in full a Board order issued on November 4, 1977. That order directed the successors and assigns of Bromine to bargain with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("Union") as the recently certified bargaining representative of Bromine's employees.
 
 
 2
 The contempt proceedings were initially referred to a Special Master, who, in his recommended decision, found that the Company was a successor to Bromine and had violated this court's May 1980 judgment by refusing to bargain with the Union. The Master recommended that the Company be adjudicated in civil contempt and be required to, among other things, bargain with the Union in order to purge itself of this contempt adjudication.
 
 
 3
 On appeal to this court, we held that the successorship determination should be made by the Board in the first instance, not by a Special Master. Accordingly, we retained jurisdiction over the case and remanded to the Board to determine the sole question of whether Great Lakes was a successor to Bromine. On remand, the Board concluded that Great Lakes was indeed Bromine's successor.
 
 
 4
 For the reasons set forth below, we hold that the Board's decision that Great Lakes was a successor to Bromine is supported by substantial evidence, and adopt that decision for purposes of our resolution of the contempt issue. Further, because Great Lakes acquired Bromine's business with knowledge both of Bromine's refusal to bargain with the then-recently certified Union and of the unfair labor practice proceedings pending against Bromine because of that refusal, Great Lakes was obligated to bargain with the Union, pursuant to the Board's November 1977 order, as a remedy for Bromine's unlawful refusal to do so. Because Great Lakes has never complied with that order as enforced by the judgment of this court in May of 1980, we agree with the Special Master that Great Lakes is in civil contempt. Accordingly, as outlined later in this opinion, we direct that Great Lakes take certain steps to purge itself of this contempt adjudication.
 
 I. Facts and Procedural History
 
 5
 This case has a long history, but the facts can be briefly stated. In June 1975, an election was held in a unit of production and maintenance workers employed by Bromine. The union won the election by a vote of eleven to nine, with ten ballots challenged. These challenges were eventually resolved by the Board which issued an order directing that five of the ten challenged ballots be opened and counted. (224 NLRB 1275) (The "Bromine I " proceedings). As a result, on July 1, 1976, the Union was certified by the Regional Director with a final vote count of 14-11. Thereafter, Bromine refused to recognize or bargain with the Union in order to test the validity of the certification.
 
 
 6
 Because Bromine refused to bargain with the Union, the General Counsel issued a complaint against Bromine alleging various unfair labor practices. (The "Bromine II " proceedings). During early 1977, an administrative law judge ("ALJ") conducted hearings on these allegations, and, on June 27, 1977, issued a report finding that Bromine had unlawfully refused to bargain with the Union following the Board's Bromine I decision and the Union's certification pursuant to that decision. On June 15, 1977, twelve days before the ALJ issued this recommended decision and order, Great Lakes took over the management of Bromine's business. The parties do not dispute that, at the time of the acquisition, Great Lakes was aware both of the Board's decision in Bromine I in which the Board had ordered the counting of various challenged ballots and of the unfair labor practice proceedings then pending before the ALJ in Bromine II.
 
 
 7
 Despite the sale of its business to Great Lakes, Bromine continued to challenge the prospect of bargaining with the Union, and, on August 1, 1977, filed exceptions to the ALJ's recommended decision in Bromine II. On November 4, 1977, the Board adopted the ALJ's recommendation and ordered Bromine and "its officers, agents, successors and assigns" to bargain with the Union upon request. 233 NLRB at 253 (emphasis added). Bromine appealed the Board's order to this court. At no time during the Board proceedings or in the subsequent appellate proceedings did either Bromine or Great Lakes inform the Board that Bromine had been acquired by Great Lakes.
 
 
 8
 On August 11, 1978, a panel of this court issued its decision enforcing the Board's decision and order in Bromine I. Bromine Div., Drug Research, Inc. v. NLRB, 580 F.2d 239 (6th Cir.1978). Accordingly, on August 28, 1978, the Union wrote to Great Lakes and requested that it begin negotiations immediately. The Union asserted that after the August 11th decision there was no longer any basis for a challenge to the election results and the Union's certification, and that bargaining should therefore begin immediately. Great Lakes nevertheless refused to bargain, and at all times thereafter has refused to recognize or bargain with the Union.
 
 
 9
 Nothing of procedural significance happened in the case over the next year and a half. Moreover, it is apparent that the Union did not make further bargaining requests to Great Lakes, and neither the Union nor the Board brought unfair labor practice charges against Great Lakes for its refusal to bargain.
 
 
 10
 On April 28, 1980, a panel of this court issued its decision enforcing in full the Board's decision in Bromine II, in which Bromine and its successors were ordered to bargain with the Union upon request. Bromine Div., Drug Research Inc. v. NLRB, 621 F.2d 806 (6th Cir.1980). A judgment was entered pursuant to that decision on May 23, 1980. Claiming not to be a successor to Bromine, Great Lakes continued to refuse to bargain with the Union although it complied with all other aspects of the Board's enforced order in Bromine II.
 
 
 11
 Subsequent to this court's decision, the Company advised the Board that it would stipulate to another election, to be conducted by the Board, so that the representational wishes of its employees could be determined. This offer for a new election was rejected by both the Union and the Board. Also, on July 25, 1980, 41 of the 44 hourly production and maintenance employees of Great Lakes signed a decertification petition expressing their desire not to be represented by the Union. On August 26, 1980, the Acting Regional Director for the Seventh Region dismissed the petition on the grounds that the bargaining order issued against Bromine had never been complied with. A request for review of the dismissal was denied by the Board on January 26, 1981.
 
 
 12
 On January 28, 1981, the Board's General Counsel initiated these civil contempt proceedings against Great Lakes for refusing to recognize and bargain with the Union in contravention of this court's May 23, 1980 judgment enforcing the Board's decision in Bromine II. On November 3, 1981, Senior United States District Judge Thomas P. Thornton (now deceased) was appointed Special Master by this court to hear the evidence and recommend findings of fact and conclusions of law with respect to the issues raised by the pleadings. The Special Master heard arguments and, on May 26, 1983, issued a report in which he found that Great Lakes was a successor to Bromine and accordingly was obligated to bargain with the Union. The Special Master further recommended that Great Lakes be found in civil contempt and that certain relief in purgation be directed.
 
 
 13
 Great Lakes immediately objected to the Special Master's report, arguing, among other things, that the successorship determination must be made by the Board in the first instance, not by the court upon recommendations which had been made by its Special Master. This court agreed with Great Lakes and, retaining jurisdiction of the case, remanded to the Board to determine "the sole question of whether Great Lakes is a successor to [Bromine]." Aquabrom, Division of Great Lakes Chemical Corp. v. NLRB, 746 F.2d 334, 337 (6th Cir.1984).
 
 
 14
 On remand, the Board, in a decision issued on June 30, 1986, found that Great Lakes was a successor to Bromine. 280 NLRB No. 66 (July 15, 1986). The Board began its analysis by stating the well-settled rule, upheld in Golden State Bottling Co. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), that a successor employer who acquires the predecessor's business with knowledge of unfair labor practice charges against the predecessor is responsible for remedying the predecessor's unlawful conduct. Since it was undisputed that Great Lakes had knowledge of the unfair labor practice charges pending against Bromine when it took over the business, the Board indicated that the only issue before it was the successorship status of Great Lakes. In concluding that Great Lakes was a successor employer, the Board applied its traditional test for successorship status which was upheld by the Supreme Court in NLRB v. Burns Int'l Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Thus, the Board looked to whether there was a "substantial continuity in the employing enterprise," and considered several factors including continuity in employees, supervisors, and product lines. 280 NLRB No. 66 at 4.
 
 
 15
 Following the issuance of the Board's decision on remand, Great Lakes continued to refuse to bargain with the Union and filed timely exceptions in this court to the Board's decision on the successorship question. These contempt proceedings are, therefore, back before this court in essentially the same posture as in 1984, only this time the court has the benefit of the Board's successorship determination.
 
 II. Successorship
 
 16
 The threshold issue that must be addressed is, of course, Great Lakes's status as a successor under NLRB v. Burns Int'l Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and its progeny. It is this status that will define any possible obligation Great Lakes might have to bargain with the certified representatives of Bromine's employees, or to remedy Bromine's unfair labor practices, and, as such, it is from this status that any possible contempt liability against Great Lakes would be derived.
 
 
 17
 This court will sustain the Board's determination that Great Lakes was a successor to Bromine if it is supported by substantial evidence found in the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); Thomas Industries, Inc. v. NLRB, 687 F.2d 863 (6th Cir.1982). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. NLRB v. Jarm Enterprises, Inc., 785 F.2d 195, 199 (7th Cir.1986). Moreover, this court will not displace the Board's reasonable inferences even if we might have reached a different result had the matter been before us de novo. Applying this standard of review in light of the applicable substantive law in the successorship area, we conclude that the Board did not err in finding that Great Lakes was a successor to Bromine.
 
 
 18
 In conducting the successorship inquiry, the Board applied the test for successorship status which has been affirmed by the United States Supreme Court. See NLRB v. Burns Int'l Security Services, 406 U.S. at 280-81 & n. 4, 92 S.Ct. at 1578-79 & n. 4. Under this test, the Board focuses on whether there is "substantial continuity" between the employing enterprises such that the employees who are retained will "understandably view their job situations as essentially unaltered." Golden State Bottling Co. v. NLRB, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973).
 
 
 19
 The "substantial continuity" inquiry is factual in nature and is based upon the totality of the circumstances of a given situation. In conducting the inquiry, the Board examines a number of factors, including, most significantly:
 
 
 20
 Whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.
 
 
 21
 Fall River Dyeing & Finishing Corp. v. NLRB, --- U.S. ----, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987) (citing cases). By focusing on the employees' perspective in conducting the substantial continuity inquiry, the Board furthers the Act's policy of industrial peace. That is, "if the employees find themselves in essentially the same job after the employer transition and if their legitimate expectations in continued representation by their union are thwarted, their dissatisfaction may lead to labor unrest." Id. (citing Golden State Bottling, 414 U.S. at 184, 94 S.Ct. at 425).
 
 
 22
 Applying these principles to the facts of this case, we find that the Board's determination that there was "substantial continuity" between Bromine and Great Lakes and that Great Lakes was Bromine's successor is supported by substantial evidence in the record. Great Lakes acquired all of Bromine's assets, including its machinery and equipment, and continued operating the production plant at the same location. All of the former Bromine employees were retained after the takeover and their job functions were unchanged, as were the conditions under which they worked.[1] Moreover, the Bromine supervisors all continued in their positions following the takeover. The only exception was former Bromine President, Dr. Lorraine Patterson, who was dismissed as president, but retained by Great Lakes in a consulting capacity. Finally, the two products produced by Bromine continued to be made by Great Lakes for the same customers. In short, Great Lakes simply acquired and continued operating, without any hiatus, an intact and functioning business. Under these circumstances, it could reasonably be found that from the employees' perspective their jobs did not change.
 
 
 23
 Great Lakes argues that it is not a successor because it made a number of changes in the employing enterprise at the time of the takeover and thereafter. These changes include: (1) the removal of the Bromine president from a personnel role; (2) the institution of a different sales program and an informal job bidding system; (3) the gradual revision of the company's marketing structure during the years following the takeover to emphasize sales to individual customers and to phase out the use of distributors to sell to retail outlets; (4) the opening in December 1977, of a plant addition designed to manufacture a raw material used in the Company's production of Dihalo; and (5) the expansion of the product line during 1979 to 1981 to include three additional Bromine-related products.
 
 
 24
 We hold that the Board reasonably concluded that these and other changes were not sufficient to establish the absence of successorship status. Many of the changes were simply cosmetic modifications to the physical and organizational structure, and, thus, irrelevant to the successorship inquiry. NLRB v. Jarm Enterprises, Inc., 785 F.2d 195, 200 & n. 2 (7th Cir.1986) (citing cases). Further, while the changes made over time in the operations of the business were more substantive in nature, these too do not negate a successorship finding. As the Board observed with regard to these evolutionary changes:
 
 
 25
 [T]he determination of whether a new employer is a successor "does not focus on whether the new employer has become a bigger or better business." [citing NLRB v. Jeffries Lithograph Co., 752 F.2d 459, 465-66 (9th Cir.1985) ] Changes over time in a business operation can be expected whether or not there is a change in ownership. The critical focus of inquiry is not the extent of change, but rather whether the change is of the kind that would affect the employees' representational desires. [citing Premium Foods, Inc. v. NLRB, 709 F.2d 623, 627 (9th Cir.1983) ]
 
 
 26
 280 NLRB No. 66 at 7. We agree that the operational changes here, many of which were made months and even years following the June 1977 takeover, would not have affected the employees' representational desires to an extent sufficient to negate a successorship finding.
 
 III. Duty to Bargain with the Union
 
 27
 Our conclusion that Great Lakes was a successor to Bromine does not, of course, settle this matter. We must now address what, if any, legal obligations Great Lakes has acquired on these particular facts as a result of its successorship status. See Howard Johnson Co. v. Detroit Local Joint Executive Bd., 417 U.S. 249, 262 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974).[2] More specifically, because we are ultimately concerned with whether Great Lakes is in civil contempt of a judgment of this court enforcing a bargaining order, we must determine the scope of Great Lakes's legal obligation, as a successor, to bargain with the Union representing Bromine's employees at the time of the takeover.
 
 A.
 
 28
 The case law in this area of labor law establishes two distinct legal theories under which successors have been found obligated to bargain with unions representing their predecessor's employees. See, e.g., NLRB v. Winco Petroleum Co., 668 F.2d 973, 979 (8th Cir.1982); NLRB v. Cott Corp., 578 F.2d 892, 894 (1st Cir.1978). Under the first theory, a bargaining obligation devolves upon the successor by operation of law whenever, despite a change in ownership, the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently-certified bargaining agent. NLRB v. Burns Int'l Security Services, 406 U.S. at 281, 92 S.Ct. at 1579. This bargaining obligation, called an independent obligation because it is not tied in with the predecessor 's conduct, continues for so long as the union enjoys a rebuttable presumption of majority support. Fall River Dyeing, 107 S.Ct. at 2235. As the court explained in Fall River Dyeing, the recognition of such an obligation in successorship cases promotes stability in collective bargaining relationships and furthers industrial peace. Id. at 2233.
 
 
 29
 Under the second theory, by contrast, a successor is obligated to bargain not as an independent duty, but derivatively as a remedy for the unfair labor practices of the predecessor. The source of the derivative bargaining obligation is the Supreme Court's decision in Golden State Bottling, supra. There it was held that under section 10(c) of the Act, the Board could require a successor employer, who has not itself committed an unfair labor practice, to remedy an unfair labor practice committed by the predecessor employer where the successor acquired the business with knowledge of the labor litigation and continued to operate the enterprise without substantial change or interruption. Golden State Bottling, 414 U.S. at 179-86, 94 S.Ct. at 422-26; Winco Petroleum, 668 F.2d at 977. The basis for this principle is not focused on the conduct of the successor but, rather, the "need to prevent mere changes in the title to the business from frustrating the national labor policy of remedying unfair labor practices." NLRB v. Jarm Enterprises, 785 F.2d at 202. While Golden State specifically involved requiring a successor to reinstate an employee as a remedy for the predecessor's unlawful discharge of that employee (a section 8(a)(3) violation), the Board and the courts have not hesitated to apply Golden State to require a successor to bargain with a union as a remedy for a predecessor's unlawful refusal to bargain (a section 8(a)(5) violation). See, e.g., Winco Petroleum, 668 F.2d at 976-78.[3]
 
 
 30
 As an initial matter we note that both of these theories are potentially applicable in this case to establish a legal obligation on Great Lakes's part to bargain with the Union. That is, when Great Lakes took over the business, and continued its operations without substantial change, it would presumably have acquired by operation of law an independent obligation to bargain as a Burns successor with the recently-certified Union representing Bromine's employees. Further, because Great Lakes admittedly took over Bromine's operations with knowledge of the unfair labor practice litigation pending against Bromine, it would have become derivatively obligated, as a Golden State successor, to bargain with the Union as a remedy for Bromine's unfair labor practices.
 
 
 31
 Although both of these theories presumably define bargaining obligations which Great Lakes was required to honor because of its successorship status, we believe that these civil contempt proceedings involve only the existence and scope of Great Lakes's derivative obligation to bargain as a remedy for Bromine's unfair labor practices. In order to understand why we have narrowed the focus in this way, it is important to remember the context in which we are being asked to determine Great Lakes's legal obligations.
 
 
 32
 The Board brought these civil contempt proceedings seeking to have Great Lakes declared in contempt, not for failing to comply with a bargaining order directed to Great Lakes in administrative proceedings to which Great Lakes was a party, but for failing to comply with a judgment of this court enforcing a bargaining order directed to Bromine and its successors. Thus, the Board chose to utilize civil contempt proceedings to determine, in the first instance, Great Lakes's legal obligation as a successor employer to remedy an unfulfilled bargaining order entered in proceedings involving Bromine. Neither the Board nor the Union ever initiated administrative proceedings directly against Great Lakes with regard to its independent bargaining obligation, and, accordingly, no order has ever been issued directing Great Lakes to honor that independent obligation.
 
 
 33
 In remanding this case, we suggested that, while the factual determination of successorship is best made by the Board, the legal obligations of Great Lakes could be determined in the first instance in the context of the contempt proceeding itself. This position is consistent with a number of cases holding that the Board can utilize civil contempt proceedings in the first instance to impose a derivative obligation upon a successor to remedy an unfulfilled order directed to the predecessor employer and its successors and assigns. See, e.g., Golden State Bottling, 414 U.S. at 178-79, 94 S.Ct. at 422. (A Board order running against successors or assigns "is ... an injunction enforcible by contempt."); NLRB v. FMG Indus., 820 F.2d 289 (9th Cir.1987); NLRB v. Tempest Shirt Mfg. Co., 285 F.2d 1, 5 (5th Cir.1960); NLRB v. Ozark Hardwood Co., 282 F.2d 1, 4 (8th Cir.1960). We are not, however, aware of any similar authority entitling the Board to bypass the administrative process and instead seek, in the first instance, a civil contempt adjudication against the successor with regard to its failure to honor a supposed independent bargaining obligation. This is not to say that Great Lakes did not have an independent obligation to bargain as a Burns successor. However, in our view, the company's presumed failure to honor that obligation cannot be remedied in civil contempt proceedings unless first there had been unfair labor practice charges brought against Great Lakes and an order directed to it with respect to its independent bargaining obligation. Cf. Winco Petroleum, 668 F.2d at 979; Cott, 578 F.2d at 894.
 
 B.
 
 34
 Having determined that civil contempt will lie against Great Lakes only with regard to a failure to honor its derivative obligation to bargain as a remedy for Bromine's unfair labor practices, we now address more completely the extent of that derivative obligation in the circumstances of this case. In this regard, as will be discussed below, we conclude that Great Lakes was, and continues to be, obligated as a Golden State successor to bargain with the Union as a remedy for Bromine's unlawful refusal to do so.
 
 
 35
 The determination of whether a successor is obligated to remedy its predecessor's unfair labor practices ultimately involves a balancing of "the conflicting legitimate interests of the bona fide successor, the public, and the affected employees." Golden State, 414 U.S. at 181, 94 S.Ct. at 423. The Board and the courts have made clear that central to the balance in a case of derivative remedial relief is a finding that the successor had knowledge of the predecessor's unfair labor practices. See, e.g., NLRB v. Jarm Enterprises, 785 F.2d at 204. As the Court explained in Golden State, because liability only attaches to a successor with knowledge of the unfair labor practices, the successor can offset the potential cost of liability by seeking an indemnity clause or a reduction in the purchase price at the time of the change in ownership. Golden State, 414 U.S. at 185, 94 S.Ct. at 425.
 
 
 36
 In this case, Great Lakes does not deny that at the time of the takeover it had knowledge both of Bromine's refusal to recognize and bargain with the Union and of the unfair labor practice proceedings pending against Bromine as a result of this refusal. The presence of such knowledge, when coupled with a determination that the Board's findings on the successorship/substantial continuity issue are supported by substantial evidence, generally will be a sufficient basis upon which to require an employer to remedy the unfair labor practices of its predecessor, including a refusal to bargain. Golden State, 414 U.S. at 179-86, 94 S.Ct. at 422-26. Despite this general principle, Great Lakes makes essentially two arguments in support of its belief that it is not legally obligated to bargain with the Union in the circumstances of this case. First, since the Board is ultimately concerned with whether the Company must comply with the unfulfilled order directing Bromine and its successors to bargain with the Union "upon request," Great Lakes argues that it cannot be obligated to bargain because the indicia of successorship status were no longer present in August of 1978 when the Union made its first and only bargaining request to Great Lakes. Second, the Company argues that, even if at one time it was a successor with a legal obligation to bargain, it was nevertheless justified in not honoring that obligation because of a "good faith doubt" as to the Union's continued majority status. Both of these arguments are without merit.
 
 
 37
 Great Lakes's first argument essentially boils down to this two-part assertion: (1) Since the unfulfilled remedial order required Bromine and its successors to bargain "upon request," Great Lakes can only be required to bargain if all the indicia of successorship status were still present at the time the Union made the requisite request; (2) because the indicia of successorship status were no longer present in August of 1978 when the Union requested Great Lakes to bargain, the Company is not required to remedy the unfulfilled bargaining order. While this argument has some superficial appeal, it cannot survive close scrutiny in the circumstances of this case.
 
 
 38
 As discussed earlier, the Union's first formal demand for bargaining was made to Bromine shortly after the Union's certification in July of 1976. After Bromine refused to bargain in order to test the validity of the certification, the Union filed unfair labor practice charges which eventually resulted in the November 1977 Board order, enforced by this court, directing Bromine and its successors to bargain with the Union upon request. In "diligently pursuing the representation proceedings and in pressing the unfair labor practices charges," the Union established its demand as a "continuing bargaining demand," see, e.g., Enterprise Products Co., 265 NLRB 544, 563 (1982), which demand was in effect at the time of the takeover in June of 1977. At that time, although Great Lakes had full knowledge of the unfair labor practice proceedings then being vigorously pursued before the ALJ, Great Lakes made absolutely no effort to comply with the Union's outstanding bargaining demand. Nor did Great Lakes move to recognize the Union when the ALJ issued his decision less than two weeks later directing Bromine and its successors to bargain, or when the Board affirmed that decision in November. Instead, Bromine, which was owned and controlled by Great Lakes, continued to challenge the Board's order to bargain with the Union by filing a petition for review of the Board's decision in Bromine II. Then, even when this court rebuffed Great Lakes's challenge by enforcing the Board's order, Great Lakes still did not recognize the Union, and to this day, continues to deny any legal obligation to do so.
 
 
 39
 In these circumstances, it not only is evident that Great Lakes was fully aware of the Union's interest in recognition and bargaining at the time of the takeover, but also that Great Lakes never had any intention of recognizing or bargaining with the Union at any stage.[4] Accordingly, the Company cannot be heard to argue that a renewed request for bargaining was necessary before its successorship status, and resultant bargaining obligation, could be determined. In our view, a purely formal bargaining demand by the Union in June of 1977 would clearly have been futile in the circumstances of this case. Consequently, the absence of such a demand does not affect either the Board's successorship determination or the scope of the Company's remedial bargaining obligation.
 
 
 40
 The Company's second argument is that it cannot be obligated to bargain with the Union because of its good faith doubt as to the Union's majority status. This asserted doubt is based upon three alleged factors: (1) high employee turnover in the bargaining unit since the 1975 election; (2) the filing of a decertification petition by employees in 1980; and (3) the Union's disinterest in representing the employees. We agree with the Special Master that this asserted doubt is unavailing in the context of this case.
 
 
 41
 It is a general rule in labor law that a Board-certified collective bargaining representative enjoys a conclusive presumption of majority support during the year following its certification. Brooks v. NLRB, 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954). While this certification year ordinarily will begin running from the date of the union's certification, where an employer has refused to bargain at all, the one year presumption of majority support will extend from the date the employer commences to bargain in good faith. NLRB v. Lexington Cartage Co., 713 F.2d 190, 193 (6th Cir.1983); NLRB v. Lee Office Equipment, 572 F.2d 704, 707 (9th Cir.1978). Following the certification year, the union is entitled to a rebuttable presumption of majority support. Landmark Int'l Trucks, Inc. v. NLRB, 699 F.2d 815, 818 (6th Cir.1983). The rationale behind these presumptions is that the "bargaining relationship ... must be permitted to ... function for a reasonable period in which it can be given a fair chance to succeed." Frank Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944). It is beyond dispute that these presumptions are applicable in successorship cases. See, e.g., Burns, 406 U.S. at 279, 92 S.Ct. at 1577; Dynamic Machine Co. v. NLRB, 552 F.2d 1195, 1203 (7th Cir.1977). Indeed, in Fall River Dyeing, the Supreme Court observed that the rationale behind the presumptions is "particularly pertinent" in successorship cases because "[d]uring a transition between employers, a union is in a peculiarly vulnerable position." Fall River Dyeing, 107 S.Ct. at 2233. While Fall River involved a successor's independent bargaining obligation under Burns, we can conceive of no reason why these presumptions should not apply with equal force in cases, such as this one, involving a derivative bargaining obligation.
 
 
 42
 In this case, the Union, which was elected by a majority of the unit employees and certified by the Board, has never been given even the slightest chance to succeed by either Bromine or Great Lakes, let alone the "fair chance" required by Frank Bros., supra. Rather, since the certification, as discussed above, first Bromine and then Great Lakes have adamantly refused to bargain and have challenged their obligation to do so at every turn. In these circumstances, it is evident that the certification year has not ended because neither Bromine nor Great Lakes has ever permitted it to begin. Accordingly, we agree with the Special Master that the Union remains entitled, even at this late date, to a conclusive presumption of majority support and that, as such, Great Lakes may not defend against its obligation to remedy Bromine's unlawful refusal to bargain on the basis of any supposed good faith doubt as to the Union's continued majority status.
 
 
 43
 We have no difficulty reaching this conclusion with respect to each of the three "factors" upon which Great Lakes has based its supposed good faith doubt. Thus, because the Union has never been given a chance to succeed, Great Lakes is clearly precluded by Brooks from relying on the inevitable turnover in unit employees as a basis for its refusal to bargain. Likewise, as the Special Master concluded, absent extraordinary circumstances not presented here, the filing of a decertification petition during the period in which the bargaining representative enjoys a conclusive presumption of majority support does not privilege the employer's refusal to bargain. NLRB v. Lexington Cartage Co., 713 F.2d 190, 193 (6th Cir.1983). Finally, since we see no indication that the union has either disclaimed an interest in representing this bargaining unit, or has dissolved or become defunct, the contention regarding union "disinterest" cannot succeed. Brooks, 348 U.S. at 98-99, 75 S.Ct. at 178.
 
 
 44
 We do not believe that it is inconsistent with Golden State to prohibit Great Lakes from asserting a good faith doubt in the circumstances of this case. Motivating the Court's decision in Golden State was its belief that by requiring a bona fide successor to remedy its predecessor's unfair labor practices, certain "important policies subserved by the [Act],"--avoidance of labor strife, prevention of a deterrent effect on the exercise of section 7 rights, and protection for victimized employees--were achieved at a relatively minimal cost to the successor. Golden State, 414 U.S. at 185, 94 S.Ct. at 425. In our view, it would seriously undermine these asserted purposes to allow a successor, who has succeeded in putting off its remedial bargaining obligation as long as Great Lakes has, to avoid that obligation on the basis of the inevitable decline that will occur over time in a union's support.
 
 
 45
 When Great Lakes took over Bromine, continuing its operations without hiatus and in substantially unchanged form, it had full knowledge of the pending charges regarding Bromine's refusal to bargain. Consequently, Great Lakes's status as Bromine's successor was not open to serious question twelve days after the takeover when the ALJ directed Bromine and its successors to bargain with the Union. Nor was it open to question in November when the Board affirmed that decision. As Bromine's successor, Great Lakes was under no financial obligation to the Union, nor was it required to consent to be bound by any substantive contractual provisions; it was simply required to recognize the Union and bargain with it, to agreement or impasse, as a remedy for Bromine's unlawful refusal to do so. While we certainly do not dispute the Company's right to contest its successorship status, as it has vigorously done in these contempt proceedings, we do not believe that once that status has been determined the Company can avoid its resulting bargaining obligation by arguing that the Union no longer has the support it once had. A union's support will usually erode over time, particularly where, as here, the union has never been given the chance to succeed. This erosion in support generally will be due not only to the inevitable turnover in bargaining unit employees, but also to such things as employee disenchantment with the "dormant" status of its elected bargaining representative. In our view, to permit a successor to rely on this inevitable erosion in a union's support removes any incentive the successor might have to honor, without Board intervention, a remedial bargaining obligation, and, further, encourages litigation and rewards delay. To allow such a defense would not only be inconsistent with the rationale underlying the conclusive presumption of majority support during the certification year, but would also permit successors to evade too easily the strong congressional policy in favor of remedying a predecessor's unfair labor practices.
 
 
 46
 This is not to say that a successor's obligation to remedy a predecessor's unfair labor practices is without any limits. As the Supreme Court noted in Golden State:
 
 
 47
 A purchasing company cannot be obligated to carry out under Sec. 10(c) [of the Act] every outstanding and unsatisfied order of the Board. For example, because the purchaser is not obligated by the Act to hire any of the predecessor's employees ..., the purchaser, if it does not hire any or a majority of those employees, will not be bound by an outstanding order to bargain issued by the Board against the predecessor or by any order tied to the continuance of the bargaining agent in the unit involved.
 
 
 48
 Golden State, 414 U.S. at 184 n. 6, 94 S.Ct. at 425 n. 6 (emphasis added & citations omitted). In this case, of course, Great Lakes hired every single one of the predecessor's employees at the time of the takeover, and so the Court's example is not directly applicable in this context. Cf. Bellingham Frozen Foods, Inc. v. NLRB, 626 F.2d 674 (9th Cir.1980) (court refused to enforce reinstatement order against successor employer where that order was tied to continuance of the bargaining agent in the unit because the successor had not hired any of the employees in that bargaining unit ).
 
 
 49
 The First Circuit, however, on the basis of the above-quoted language from Golden State, has held that a bargaining order should not be enforced against a successor employer, who had originally hired a majority of the predecessor's employees, where the basis for the bargaining order remedy has disappeared due to a change in circumstances. NLRB v. Cott Corp., 578 F.2d 892, 894-95 (1st Cir.1978). In our view, the Cott case is distinguishable.
 
 
 50
 In Cott, the Board, on the authority of NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), entered an order directing the predecessor employer to bargain with the union on the basis of a card majority because, in the Board's determination, the predecessor's unfair labor practices had made a fair election in the unit unlikely. Relying on the language from Golden State, the court declined to enforce this Gissel bargaining order against the successor because, in the court's view, the circumstances which had originally supported the Gissel bargaining order against the former employer had fundamentally changed by the time of the enforcement proceeding against the successor employer. Cott, 578 F.2d at 895. Specifically, the court was persuaded by the fact that the former employer whose misconduct had prejudiced the representation election and made a fair rerun election impossible, and the former employees who had been adversely affected by the former employer's misconduct, were no longer on the scene at the time of the enforcement proceedings against the successor employer. Id.
 
 
 51
 In our view, the court's holding in Cott should not be extended beyond the context of Gissel-based bargaining orders. Because such bargaining orders are entered on the basis of a card majority and only after a determination has been made that an employer's unfair labor practices have made a fair election unlikely, it is somewhat appropriate to view them as vulnerable to the passage of time and employee turnover. Thus, if the effects of the unfair labor practices upon which the order is based are no longer felt in the unit, it is preferable to hold a new election in that unit rather than require the successor employer to remedy the unfulfilled Gissel bargaining order. As the court stated in Cott, "[w]hen the circumstances that originally indicated an election would be biased disappear, an election again becomes the best way of discovering the employees' intent." Cott, 578 F.2d at 895 (emphasis added). In this case, however, since the original bargaining order was based upon a valid election and Board certification pursuant to that election, the employees' representational desires have already been expressed in the "best way" possible. Despite this fact, the employees' chosen bargaining representative has never been given even the slightest chance to succeed by either Bromine or Great Lakes. In these circumstances, we believe it is consistent both with the certification bar doctrine and with the congressional policy in favor of remedying a predecessor's unfair labor practices to require Great Lakes, as a successor employer, to honor the outstanding bargaining obligation even though the certified Union's support has eroded, as it inevitably will, due to changed circumstances and employee turnover.
 
 
 52
 IV. Contempt Adjudication and Purgation Order
 
 
 53
 Since May 23, 1980, when this court's judgment enforcing the Board's bargaining order issued, Bromine and its successors and assigns have been under a court-imposed obligation to recognize and bargain with the Union. Notwithstanding that obligation, the Company has at all times since the entry of that judgment refused to bargain with the Union. In view of our conclusions that the Board's determination on the successorship question is supported by substantial evidence and, further, that, as a Golden State successor, Great Lakes was, and continues to be, obligated to bargain with the Union as a remedy for Bromine's unlawful refusal to do so, we adopt the recommendation of the Special Master that Great Lakes be adjudicated in civil contempt of this court's May 1980 judgment.
 
 
 54
 In opposition to a contempt citation, the Company argues that this court's judgment was too vague and indefinite to put it on notice that it was required to abide by the remedial provisions in the order. In particular, the Company believes it should not be required to guess whether it is a successor and thus bound by a bargaining order directed to successors and assigns. This argument is without merit. An employer must always decide in the first instance what its legal obligations are, including its legal obligations as a successor employer. The Board does not provide declaratory judgments in such circumstances. If an employer is incorrect in its assessment of its legal obligation to comply with a bargaining order directed to successors and assigns, the Board may, as we discussed earlier, see supra at 1180-1181, seek a civil contempt adjudication against the successor for failing to honor that derivative bargaining obligation. Granted, an employer will not be found in civil contempt of such a bargaining order until a factual determination is made that it is indeed a successor, a principle which this court recognized in remanding the case to the Board to make the initial successorship decision. But, this certainly does not mean that the employer is relieved of its responsibility for assessing its own legal obligations, nor does it mean that the employer is entitled to a determination of its successorship status before the civil contempt proceedings can be initiated by the Board. See, e.g., NLRB v. FMG Indus., 820 F.2d 289 (9th Cir.1987).
 
 
 55
 Having concluded that the Company is in contempt of this court's judgment, we proceed to a determination of the appropriate purgation order. We note that any purgation order we enter should seek to " 'dissipate the unwholesome effects of violations of the Act,' and to restore the situation, as nearly as possible, to what should have obtained but for these violations." Office & Professional Employees Int'l Union, Local 425 v. NLRB, 419 F.2d 314, 322 (D.C.Cir.1969) (quoting Frank Bros. Co. v. NLRB, 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944)). "The measure of the Court's power in civil contempt proceedings is determined by the requirements of full remedial relief. They may entail the doing of a variety of acts...." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 501, 93 L.Ed. 599 (1949). The only limitation is that in a civil proceeding, the sanctions must not be penal in nature, but must be coercive or remedial.
 
 
 56
 In view of these principles, we will enter the following remedial order:
 
 
 57
 In the exercise of the Court's supervisory powers the Honorable Robert M. DeMascio, Senior United States District Judge, Eastern District of Michigan, is hereby designated as Special Master succeeding the late Senior United States District Judge Thomas P. Thornton.
 
 
 58
 The National Labor Relations Board ("Board") having filed a petition to adjudge respondents Aquabrom, Division of Great Lakes Chemical Corp. and Tesco Chemicals, Inc., a wholly owned subsidiary of Great Lakes Chemical Corp. (collectively referred to as "Great Lakes"), as successors to Bromine Division, Drug Research, Inc., ("Bromine"), in civil contempt for refusing to comply with a judgment of this court entered May 23, 1980; and the late Judge Thomas P. Thornton in his capacity as Special Master having made a report recommending that respondents be adjudged in civil contempt of this court and be required to purge themselves thereof; and the Board, upon remand from this court, having determined that Great Lakes was indeed Bromine's successor:
 
 
 59
 It is ordered that the Board's finding that Great Lakes is Bromine's successor be affirmed in all respects, and, consistent therewith, that the Special Master's recommendation that Great Lakes be adjudged in civil contempt of this court's May 23, 1980 judgment, be adopted.
 
 
 60
 It is further ordered that Great Lakes is hereby adjudged in civil contempt of this court for violating and disobeying the aforesaid judgment.
 
 
 61
 It is further ordered that Great Lakes, its officers, agents, successors and assigns, including such other division, branch or subsidiary of Great Lakes as may now be operating the former Bromine plant located in Adrian, Michigan, shall purge themselves of such contempt by:
 
 
 62
 (a) Fully complying with and obeying the judgment of May 23, 1980, by bargaining collectively with the certified Union as the representative of the employees in the appropriate unit in the manner set forth in (b) below, for a period not to exceed six months, or until a bona fide impasse is reached, and if any understanding is reached, embodying such understanding in a signed agreement.
 
 
 63
 (b) Proceeding with the officials of the Union to set an initial meeting date, not to exceed 15 days from entry of this order, and thereafter proceeding to bargain for the aforesaid period at regular and reasonable intervals, unless the respondents and the Union otherwise mutually agree in writing. The existence of a bona fide impasse shall be reported to the Special Master who shall endeavor to resolve it. In no event shall respondents unilaterally refuse to meet with the Union at regular and reasonable intervals, not to exceed 30 days, or withdraw recognition from the Union during said period as collective bargaining representative without further order of the Court.
 
 
 64
 (c) Interim written status reports signed by respondents shall be filed with the Special Master, with copies mailed to the Director of the Board's Seventh Region and the Union, at least on a monthly basis.
 
 
 65
 At the end of the six month period the Special Master shall make a finding as to whether or not respondents have purged themselves of contempt by complying with and obeying the judgment of May 23, 1980. The Special Master shall thereupon certify such finding to the Court.
 
 
 66
 In order to insure compliance with the foregoing provisions, it is further ordered that in the event of failure of the respondents to purge themselves of contempt as herein provided, this court shall impose an appropriate fine on the respondents and may take further steps by fine or otherwise to assure compliance in the future.
 
 
 
 [1]
 The record shows that one week after the takeover, 36 of Great Lakes's 44 employees were former Bromine employees. Further, by September 1977, even with the rapid turnover characteristic of this operation and a net decline in employment to 32, former Bromine employees continued to represent a substantial majority (23 out of 32) of Great Lakes's employees
 
 
 [2]
 The Court in Howard Johnson stated:
 The question whether Howard Johnson is a "successor" is simply not meaningful in the abstract. Howard Johnson is of course a successor employer in the sense that it succeeded to operation of a restaurant and motor lodge formerly operated by the Grissoms. But the real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative. The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the Union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.
 417 U.S. at 262 n. 9, 94 S.Ct. at 2243 n. 9.
 
 
 [3]
 Indeed in our earlier decision in this case, we made the following observation:
 Although refusal to bargain with an authorized collective bargaining representative is an 8(a)(5) unfair labor practice, the Board has not provided, nor have we been able to discover, any reason for not extending the holding of Golden State to an 8(a)(5) situation.
 Aquabrom, Division of Great Lakes Chemical Corp. v. NLRB, 746 F.2d 334, 336 n. 1.
 
 
 [4]
 That the Union viewed the Company's actions as an indication that it never had any intention of bargaining is suggested by the terms of the demand that the Union ultimately made to Great Lakes in August of 1978. In that demand, the Union asserted that, in light of this court's decision two weeks earlier enforcing the Board's order in Bromine I, there was no longer any basis for a challenge to the election results and the Union's certification. The letter was not a "new" demand requesting bargaining in the first instance, but was rather an attempt to persuade Great Lakes that there were no longer any viable arguments that could be made to justify its continued refusal to bargain